**FEDERAL HOME LOAN MORTGAGE CORPORATION, Appellee,**

**v.**

**WUEST et al., Appellants.**

[Cite as *Federal Home Loan Mtge. Corp. v. Wuest* (1989), 64 Ohio App.3d 513.]

Court of Appeals of Ohio,
Montgomery County.

No. 11549.

Decided Sept. 21, 1989.

*Douglas B. Gregg,* for appellee.

*William L. Wuest* and *Helen H. Degler, pro se.*

---

FAIN, Judge.

Defendants-appellants William L. Wuest and Helen H. Degler, hereinafter collectively referred to as "borrowers," appeal from a summary judgment foreclosing on a mortgage loan made to them by First Federal Savings and Loan Association of Lima ("First Federal"), and assigned to plaintiff-appellee Federal Home Loan Mortgage Corporation ("FHLMC"). In its complaint, FHLMC prayed for foreclosure, judgment on the note and both compensatory and punitive damages for fraud. In their amended answer and counterclaim, the borrowers made claims against FHLMC, and also brought in First Federal

as a third-party defendant, asserting claims for slander of credit and for fraudulently, and without authority, making them a loan of First Federal's *credit* rather than of *money*. Of these claims, only the claim for foreclosure has been expressly adjudicated by the trial court. Although the trial court's judgment arguably disposes, by implication, of the borrowers' counterclaims and third-party claim, it cannot be said to dispose of FHLMC's claim against the borrowers for fraud, nor does it dispose of FHLMC's claim for money damages on the borrowers' note. Accordingly, this appeal must be dismissed for want of a final appealable order.

## I

This is the latest of a series of cases to reach this court involving a reprehensible scheme to take unfair advantage of borrowers and lending institutions. The previous cases are: *Transamerica Financial Services v. Stiver* (1989), 61 Ohio App.3d 49, 572 N.E.2d 149; *Society Bank, N.A. v. Kellar* (1989), 63 Ohio App.3d 583, 579 N.E.2d 717; and *Merchants & Mechanics Fed. S. & L. Assn. v. Brown* (June 27, 1989), Greene App. No. 88–CA–103, 1989 WL 72225. This scheme was explained in a Wall Street Journal article that was submitted to the trial court in the case before us in support of FHLMC's motion for summary judgment.[1] In that article by Constance Mitchell, a Wall Street Journal staff reporter, the essence of the scheme was explained as follows:

"Federal authorities are investigating a scam against banks by customers paying off loans using worthless certified drafts drawn on Mexican banks.

"When such a draft is presented for payment, the U.S. bank either receives notice that the Mexican bank doesn't exist, or it receives a replacement sight-draft drawn on a second Mexican bank, thus further delaying collection.

"A sight-draft is a check that is payable 'on sight,' or on demand when presented to the bank on which it's drawn. Typically, banks don't question their use as they might a personal check, because the bank assumes the funds have been collected in advance by the issuer of the draft.

"The Federal Bureau of Investigation is investigating incidents of the fraud in at least four states—Ohio, Missouri, Arizona, and California—and an agency spokesman indicated the practice is spreading. In several midwestern

---

1. Although a newspaper article does not ordinarily satisfy the evidentiary requirements for summary judgment contained in Civ.R. 56, the borrowers, who were then represented by counsel, did not object to the introduction of this article, along with other, similar materials, in their response to the motion for summary judgment. Therefore, any objection to the consideration of these materials was waived.

cities, home owners and small business operators are paying off mortgages and other loans using worthless drafts.

" 'This is serious because the financial community is getting flooded with these things,' said Robert Siller, an FBI agent investigating the Ohio incidents. 'The losses can mount up.'

"Mr. Siller said borrowers are learning about this scheme at 'debtors parties' held at hotels in various cities. There, salesmen seek to convince attendees they can pay off their loans immediately by using a Mexican bank draft. For a fee, usually about 15% of the amount of their loans, the debtors are sold a bank draft and told that lenders, by law, must accept the draft.

"In some cases, according to the FBI, the salesmen are members of anti-banking organizations. These groups believe the Federal Reserve System is unconstitutional and they are using the practice as a way to burden the Fed, which they claim is liable for the funds once a U.S. bank accepts the drafts.

"Under an apparent technicality in federal banking laws, once a bank accepts such drafts and tries to redeem them, the borrower is off the hook. Furthermore, it is unclear whether banks that have accepted the drafts can legally collect the collateral used to secure the original loans.

"In dozens of instances, U.S. banks have agreed to accept the drafts. And, according to Mr. Siller, at least one borrower—a Sidney, Ohio farmer—got the deed back for his farm after paying off his mortgage with such a draft. His bank, which wasn't identified, has filed suit to collect on the debt, but the case is pending.

"According to lawsuits filed by several banks, the certified drafts are drawn on Panora Credit Trust, and by World Credit Reserve, both of Acapulco, Mexico. Some other banks have received drafts drawn on Central American institutions.

"The FBI spokesman said it is still unclear how the salesmen are obtaining checks from these foreign banking concerns, and whether the foreign banks even exist. And, he added, U.S. borrowers using them have been 'unduly' uncooperative."

Based on the foregoing account, the circumstances in the case before us were typical of the scheme. The borrowers used the borrowed funds to purchase a home, and, instead of repaying the borrowed funds, presented a "sight draft" drawn on the "Panora Credit Trust" with an Acapulco, Mexico address. Efforts by FHLMC to collect the draft were unsuccessful, and disclosed that the "Panora Credit Trust" did not exist.

At the hearing on the motion for summary judgment, the trial court inquired of the borrowers' attorney of record, and was unable to elicit any

representation that the "Panora Credit Trust" existed in fact. The trial court found that the alleged issuer of the sight draft did not, in fact, exist, and based its disposition of the borrowers' defenses to the foreclosure action upon that finding.

The borrowers have propounded a plethora of defenses, counterclaims, and third-party claims in this case, but the essence of their legal position is best illuminated in a colloquy between their attorney of record and the trial court during the hearing on the motion for summary judgment, as follows:

"THE COURT: What is your reasoning for claiming the original note is invalid?

"MR. MANOGG [the borrowers' attorney]: Because there was no consideration given for it.

"THE COURT: Let's expand on that a little further. Would you please explain that to me?

"MR. MANOGG: Okay. Consideration as far as we are taking the position, as far as it has to be something of value—

"THE COURT: I understand that.

"MR. MANOGG: What this lending institution did, the only consideration ever given for this note and mortgage was just a mere bookkeeping entry on their books. There was no money ever extended to the defendants. There's nothing of value given them. Now, if there's nothing of value given, if there's no money given them, then the note is no good.

"THE COURT: Uh-huh. Your client got nothing. Is that what you're saying?

"MR. MANOGG: Nothing of value, right. He got a piece of paper maybe, but nothing of value.

"THE COURT: What would your discovery that you've requested elicit? In all your wildest dreams, what do you think you might discover?

"MR. MANOGG: Nothing of value given. There's no money given to the defendants when they executed the note and mortgage. It was just a bookkeeping entry, a shuffling of paper with no money ever extended.

"THE COURT: Uh-huh.

"What do you say to that, Mr. Gregg?

"MR. GREGG [FHLMC's attorney]: Your Honor, this is one of the millions of typical transactions where Mr. Wuest, Mr. Degler [*sic*] bought a home and borrowed the money from my client in order to pay the seller the price for the home, or most of the large part of the price for the home; so it's a ridiculous position that he's taking.

"THE COURT: Is that true that they borrowed money from plaintiff to buy a home?

"MR. MANOGG: They thought they were borrowing money, but in fact they did not get money.

"THE COURT: They got their home, didn't they?

"MR. MANOGG: They're living in the home, right.

"THE COURT: You claim because the dollars didn't change hands, it was a bookkeeping entry, that that means there was no consideration; is that right?

"MR. MANOGG: Right. If in fact the originator of the note did not actually give money to whoever who was selling the house.

"THE COURT: You mean actually hand them dollars?

"MR. MANOGG: Or something that could be converted into dollars.

"THE COURT: Your client ended up with his house, didn't he?

"MR. MANOGG: Well, if I defraud you, am I entitled to keep the fruits of my fraud? No.

"THE COURT: What's the fraud?

"MR. MANOGG: By giving whoever sold this house, I don't know their name, John Doe, whoever it was, a worthless check, a worthless piece of paper in exchange for title to that real estate.

"THE COURT: You're talking about the plaintiff's check?

"MR. MANOGG: Or their possessor title [*sic*].

"THE COURT: Why is it worthless?

"MR. MANOGG: Because there's no money backing it up.

"THE COURT: We're getting down to this issue about bookkeeping reserves. Is that what you're talking about?

"MR. MANOGG: Right.

"THE COURT: Okay. That's what I want to be sure I understand.

"MR. MANOGG: And we have an expert, that former bank auditor that when we get to trial will testify to that.

"THE COURT: In other words, any banking institution that has some kind of a negative net worth can't negotiate checks. Is that what you're saying?

"MR. MANOGG: If they don't have sufficient federal reserve notes or money backing them up, that is right.

"THE COURT: Well, that applies to almost three-quarters of our savings and loans nowaday, from what I read in the paper.

"MR. MANOGG: Probably applies to a higher percentage than that.

"THE COURT: In other words, those three-fourths of the savings and loans in our country are exercising fraudulent intentions when they negotiate checks with people who want to buy homes. Is that your position?

"MR. MANOGG: Yes; if they don't have the funds to back it up, that's right.

"THE COURT: I just want to be sure I understand your position.

"MR. MANOGG: I agree with that."

The trial court had no use for the borrowers' ingenuous argument that they were victims of fraud because their loan was not in the form of "money" even though that loan accomplished their purpose in buying a home, and, as evidenced by the opinions of this court in *Transamerica Financial Services v. Stiver, Society Bank, N.A. v. Kellar,* and *Merchants & Mechanics Fed. S. & L. Assn. v. Brown,* cited *supra,* neither do we.

## II

The borrowers have asserted three assignments of error, as follows:

### "First Assignment of Error

"The trial court erred in granting summary judgment when genuine issues of material fact exist and were not addressed.

### "Second Assignment of Error

"The trial court denied defendants due process by suppressing discovery which would enable them to prove their counterclaim.

### "Third Assignment of Error

"The trial court erred in forcing defendants to retain a licensed attorney of record in order to litigate or to have access to the court."

Although this court, in recent cases, has previously rejected the borrowers' legal arguments in support of their first assignment of error, we do not find it necessary to reach the merits of this appeal. The trial court's judgment entry provides only for the remedy of foreclosure with respect to FHLMC's mortgage lien. It in no way disposes of the FHLMC claim on the promissory note, or its claim for both compensatory and punitive damages for fraud. Even if the trial court's decision were deemed to dispose, *sub silentio,* of the borrowers' counterclaims and third-party claims, it is not capable of being construed to dispose of FHLMC's claims on the promissory note and for fraud. There-

fore, this appeal must be dismissed for want of a final appealable order, since there are claims pending in the trial court that have not yet been resolved.

This appeal will be dismissed.

*Appeal dismissed.*

WILSON and GRADY, JJ., concur.